The CITY OF HOUSTON, Petitioner,

v.

Steve WILLIAMS, et al., Respondents.

No. 09–0770.

Supreme Court of Texas.

Argued Oct. 13, 2010.

Decided March 18, 2011.

Reagan Douglas Pratt, The Pratt Law Firm PLLC, Houston, Arturo G. Michel, City Attorney, Timothy J. Higley, Donald J. Fleming, David M. Feldman, City of Houston Legal Dept., Houston, for the City of Houston

E. Troy Blakeney, Jr., Richard C. Mumey, Blakeney, Flynn & Mumey PLLC, Houston, Vincent L. Marable, III, Paul Webb, P.C., Wharton, for Steve Willams.

Barbara E. Rosenberg, Assistant City Attorney, for Amicus Curiae City of Dallas.

Bennett Sandin, Texas Municipal League, Austin, for Amicus Curiae Texas Municipal League.

Randy Doubrava, Texas Municipal Police Assn., Austin, for Amicus Curiae Texas Municipal Police Association.

Justice GUZMAN delivered the opinion of the Court.

Section 271.152 of the Local Government Code, under certain circumstances, waives governmental immunity for suits alleging breach of a written contract. For a second time on interlocutory appeal, we review the City of Houston's plea to the jurisdiction in a suit by 540 former Houston Firefighters.[1] The Firefighters allege wrongful underpayment of lump sums due upon termination of their employment, but the City claims the Firefighters' suit is barred by governmental immunity. At issue is whether the City's immunity from suit is waived by section 271.152. The Firefighters point to three distinct writings they assert constitute qualifying written contracts under that section: (1) certain City of Houston Ordinances, (2) Chapter 143 of the Local Government Code, and (3) two Meet and Confer Agreements (MCAs) and a Collective Bargaining Agreement (CBA) (collectively, the Agreements) negotiated by the Houston Professional Fire Fighters Association (the Union) on behalf of the Firefighters with the City.

We hold the Ordinances and Agreements constitute written contracts within the scope of section 271.152. But we conclude that Chapter 143, standing alone, does not establish a contract between the City and the Firefighters, and as such does not fall within the scope of section 271.152's waiver of immunity. Accordingly, we affirm the court of appeals' judgment in part, reverse in part, and remand the case to the trial court for further proceedings consistent with this opinion.

## I. Background

The Firefighters assert two claims against the City, both based on alleged underpayment of lump sums owed to them when their employment with the City terminated. The first is the "debit dock" claim, alleging that previously paid overtime amounts were improperly deducted

---

1. Houston firefighter Steve Williams is no longer a party to this suit, but the parties agreed to keep his name in the style for clarity and consistency.

from the termination payment. The second is the "termination pay" claim, alleging the improper exclusion of premium pay from calculation of the termination payment. Both claims are ably described in the original court of appeals opinion, and we do not restate the details here. *See City of Houston v. Williams*, 183 S.W.3d 409, 417–18 (Tex.App.-Houston [14th Dist.] 2005), *rev'd*, 216 S.W.3d 827 (Tex.2007).

This case first came before us after the trial court granted a partial judgment in 2004, denying the City's plea to the jurisdiction and upholding the Firefighters' claims. The court of appeals affirmed that ruling, holding that governmental immunity had been waived because (1) the Firefighters were seeking a declaratory judgment, and (2) the "sue and be sued" language in the City's Charter, and the "plead and be impleaded" language of Local Government Code section 51.075, effectuated a waiver of governmental immunity. *See id.* at 426. On petition to this Court, we reversed on both grounds. As to the first, we held that because the only conceivable remedy for the Firefighters was money damages, the Firefighters " 'cannot circumvent the State's sovereign immunity from suit by characterizing a suit for money damages … as a declaratory-judgment claim.' " *City of Houston v. Williams (Williams I)*, 216 S.W.3d 827, 829 (Tex.2007) (quoting *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 856 (Tex.2002)). As to the second ground, we held, applying our then-recent ruling in *Tooke v. City of Mexia*, that immunity was not waived by the Charter and statutory language empowering the City to "sue and be sued"[2] or "plead and be impleaded." *Id.* at 828–29

(citing *Tooke v. City of Mexia*, 197 S.W.3d 325, 346–47 (Tex.2006)).

However, in the interim between the trial court's partial judgment and our initial review of this case, the Legislature retroactively waived governmental immunity for certain contract claims by enacting Subchapter I, Local Government Code Chapter 271, particularly section 271.152. *See* Act of May 23, 2005, 79th Leg., R.S., ch. 604, §§ 1–3, 2005 Tex. Gen. Laws 1548, 1548–49 (codified at TEX. LOC. GOV'T CODE §§ 271.151–.160); *Tooke*, 197 S.W.3d at 344–45. As a result, numerous pending suits against governmental units that had rested on "sue and be sued" assertions of waiver were reversed and remanded to the trial courts for consideration of whether immunity was waived under section 271.152. *See, e.g., City of Midland v. Goerlitz*, 201 S.W.3d 689, 690 (Tex.2006) (per curiam); *City of Houston v. Jones*, 197 S.W.3d 391, 392 (Tex.2006) (per curiam); *City of Houston v. Clear Channel Outdoor, Inc.*, 197 S.W.3d 386, 386–87 (Tex.2006) (per curiam). This case was one such suit. *Williams I*, 216 S.W.3d at 828–29.

Accordingly, on remand to the trial court, the Firefighters argued that certain City of Houston Ordinances constituted a written contract for which immunity was waived under section 271.152. Both the trial court and court of appeals agreed, determining again that the City's immunity had been waived. 290 S.W.3d 260, 262. The Firefighters also argued that Local Government Code Chapter 143, the two MCAs from 1995 and 1997, and the 2005 CBA, all likewise constituted written contracts within the scope of section 271.152's

---

**2.** For convenience, we hereinafter use "sue or be sued" to refer to the entire class of statutory provisions that do not alone waive governmental immunity. *See Tooke*, 197 S.W.3d at 328. Other examples include "prosecute and defend," "defend or be defended," "answer and be answered," and "complain and (or) defend." *Id.* For a partial, but extensive, list of such statutes, *see id.* app.

waiver of immunity. The court of appeals disagreed as to these points, holding Chapter 143 was not executed on behalf of the City, and the Firefighters as individuals lacked standing to enforce the Agreements. 290 S.W.3d at 265–67, 271. We now review those determinations.

## II. Jurisdiction

█ Interlocutory appeals such as this are generally final in the court of appeals. Tex. Gov't Code § 22.225(b)(3). However, there are exceptions, and, as relevant here, we may review an interlocutory appeal when the intermediate court's decision conflicts with a prior decision of another court of appeals, or of this Court. *Id.* §§ 22.001(a)(2), 22.225(c). The standard governing whether two decisions conflict for purposes of interlocutory jurisdiction was broadened by the Legislature in 2003.[3] *Stephen F. Austin State Univ. v. Flynn,* 228 S.W.3d 653, 656 n. 3 (Tex.2007). Before 2003, two decisions conflicted "when the two are so similar that the decision in one is necessarily conclusive of the decision in the other." *Id.* at 656. The current, broader standard grants this Court conflicts jurisdiction when there is "inconsistency in [courts of appeals'] respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." Tex. Gov't Code § 22.225(e).

█ The parties dispute which standard should apply to this case,[4] but we need not decide which governs, because jurisdiction would lie under either standard. The court of appeals in this case held certain City of Houston ordinances "constitute a

contract." 290 S.W.3d at 270. In direct conflict with that holding, the First Court of Appeals has held that "ordinances alone ... cannot form a contract.... The record must evidence a contract in writing between the plaintiffs and the city into which the ordinances can be read." *Overton v. City of Houston,* 564 S.W.2d 400, 403–04 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.). Here, the two decisions would be conclusive of each other, thus conferring jurisdiction under the old standard, and the inconsistency between the two should be clarified in order to prevent uncertainty and unfairness, thus establishing jurisdiction under the current rule.

Thus, we conclude this Court has jurisdiction over this interlocutory appeal under Government Code sections 22.001(a)(2) and 22.225(c).

## III. Discussion

### A. Standard of Review

█ Immunity from suit deprives a trial court of jurisdiction. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638–39 (Tex.1999) (per curiam). Accordingly, a governmental entity properly asserts immunity in a plea to the jurisdiction. *Tex. Dept. of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004). Whether a trial court possesses jurisdiction is a question of law we review de novo. *IT–Davy,* 74 S.W.3d at 855. Hence, we review de novo the central issue in this case: whether the City's governmental immunity deprives the trial court of jurisdiction.

### B. Governmental Immunity

3. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 1.02, sec. 22.225(e), 2003 Tex. Gen. Laws 847, 848–49 (codified at Tex. Gov't Code § 22.225(e)).

4. The Firefighters argue that because the original suit was filed before 2003, the nar-

rower, pre–2003 standard applies. Because our earlier decision denying jurisdiction and remanding the case to the trial court took place after 2003, the City argues the prior action was a nullity and the current standard applies.

■ When performing governmental functions, political subdivisions derive governmental immunity from the state's sovereign immunity.[5] *See City of Galveston v. State,* 217 S.W.3d 466, 469 (Tex.2007). Under the common-law doctrine of sovereign immunity, the sovereign cannot be sued without its consent. *Tooke,* 197 S.W.3d at 331. Although this rule was originally justified by the fiction that "the king can do no wrong," *id.* (citing 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 254 (1768)), in modern times its "purpose is pragmatic: to shield the public from the costs and consequences of improvident actions of their governments," *id.* at 332.

■ Sovereign immunity has two components: immunity from suit, and immunity from liability.[6] *Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 594 (Tex.2001). First, the state retains immunity from suit unless it has been expressly waived by the Legislature. *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997) (superseded by statute on other grounds). Like sovereign immunity, governmental immunity can be waived, but we defer to the Legislature to do so by statute. *City of Galveston,* 217 S.W.3d at 469. The Legislature has mandated that a statute shall not be construed as waiving immunity absent "clear and unambiguous language." TEX. GOV'T CODE § 311.034; *Tooke,* 197 S.W.3d at 328–29.

■■ Second, immunity from liability shields the state from money judgments even when the Legislature has given consent to sue. *Little–Tex,* 39 S.W.3d at 594. Nevertheless, immunity from liability is

waived when the state contracts with a private party. *Id.* Because immunity from liability constitutes an affirmative defense, not a jurisdictional bar, only immunity from suit is properly before us today. *See Miranda,* 133 S.W.3d at 224.

## C. Local Government Code Section 271.152's Waiver of Governmental Immunity

Local Government Code section 271.152 waives qualifying local governmental entities' immunity from suit for certain breach of contract claims, providing:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE § 271.152. According to its plain terms, the statute by clear and unambiguous language waives a governmental entity's immunity from suit for breach of written contract. *Ben Bolt–Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivs. Prop./Cas. Joint Self–Ins. Fund,* 212 S.W.3d 320, 327 (Tex.2006).

For section 271.152's waiver of immunity to apply, three elements must be established: (1) the party against whom the waiver is asserted must be a "local governmental entity" as defined by section 271.151(3), (2) the entity must be authorized by statute or the Constitution to enter into contracts, and (3) the entity must in fact have entered into a contract that is "subject to this subchapter," as defined by

---

5. Governmental immunity is distinct from sovereign immunity, and refers to the protection afforded to political subdivisions such as counties, cities, school districts, and others. *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3 (Tex.2003).

6. For a useful exposition on the two components of sovereign immunity in Texas, *see generally* James L. Hartsfield, Jr., *Governmental Immunity from Suit and Liability in Texas,* 27 TEX. L.REV. 337 (1949).

section 271.151(2). TEX. LOC. GOV'T CODE §§ 271.151–.152. A "contract subject to this subchapter" is defined as "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." *Id.* § 271.151(2).

The first and second elements are present as to each of the Firefighters' claims. Regarding the first, the waiver of immunity in section 271.152 applies to "local governmental entities," which include municipalities, public school and junior college districts, and various special-purpose districts and authorities. *Id.* § 271.151(3). The City is incorporated as a home-rule city—a type of municipality—*see id.* §§ 1.005, 5.004; Act of Mar. 18, 1905, 29th Leg., R. S., ch. 17, 1905 Tex. Spec. Laws 131 (granting Houston's present Charter), and thus is a "local governmental entity" for whom immunity is waived for certain contract suits under section 271.152. Concerning the second element, because the City is a chartered home-rule city, it meets section 271.152's requirement that it be "authorized by statute or the constitution to enter into a contract." *See Proctor v. Andrews,* 972 S.W.2d 729, 733 (Tex.1998) (noting that home-rule cities possess all powers of the state not inconsistent with "the Constitution, the general laws, or the city's charter," except where limited by statute). Indeed, the City's Charter specifically authorizes it to "contract and be contracted with." HOUSTON, TEX., CHARTER art. II, § 1.

The third element presents a more difficult inquiry; that is, whether the City has entered into a "contract subject to this subchapter." Section 271.151(2) effectively states five elements a contract must meet in order for it to be a contract subject to section 271.152's waiver of immunity: (1) the contract must be in writing, (2) state the essential terms of the agreement, (3) provide for goods or services, (4) to the local governmental entity, and (5) be executed on behalf of the local governmental entity. TEX. LOC. GOV'T CODE § 271.151(2). To answer that inquiry, we turn to the three separate writings the Firefighters contend are contracts under sections 271.151(2) and 271.152:(1) certain City Ordinances, (2) Local Government Code Chapter 143, and (3) the Agreements.

## D. Certain City Ordinances as Contract for Purposes of Local Government Code Section 271.152's Waiver of Governmental Immunity

The Firefighters assert that, when read together, certain sections of Chapter 34 of the Houston Code of Ordinances constitute a unilateral employment contract between the City and the Firefighters.[7] The City disagrees, arguing that the Legislature did not intend for section 271.152's waiver of immunity for certain breach of contract claims to apply to municipal ordinances. Our inquiry thus centers on whether these Ordinances, in aggregate, constitute a unilateral employment contract between the City and the Firefighters so as to waive the City's immunity from suit under Local Government Code section 271.152. To resolve this dispute, we first examine the law of unilateral contracts before applying the requirements of section 271.151(2) to the Ordinances.

### 1. Law of Unilateral Contracts

 Unlike a bilateral contract, in which both parties make mutual promises, *Hutchings v. Slemons,* 141 Tex. 448, 174 S.W.2d 487, 489 (1943), a unilateral contract is created when a promisor promises a benefit if a promisee performs, *Vanegas v. Am. Energy Servs.,* 302 S.W.3d 299, 303

---

7. The relevant Ordinances appear in full in the Appendix to this opinion.

(Tex.2009). The requirement of mutuality is not met by an exchange of promises; rather, the valuable consideration contemplated in "exchange for the promise is something other than a promise," i.e., performance. RESTATEMENT OF CONTRACTS § 12 cmt. a (1932). A unilateral contract becomes enforceable when the promisee performs. *Vanegas,* 302 S.W.3d at 303. We have explained that " '[a] unilateral contract occurs when there is only one promisor and the other accepts ... by actual performance,' " rather than by the usual mutual promises. *Id.* at 302 (quoting 1 RICHARD A. LORD, WILLISTON ON CONTRACTS § 1.17 (4th ed.2007)).

■■■ Although the concept of a unilateral contract has been questioned by some authorities, *see, e.g.,* RESTATEMENT (SECOND) OF CONTRACTS § 1, rptrs. note on cmt.f (1981), the concept enjoys continued recognition among many scholars of contract law, *see, e.g.,* 1 WILLISTON ON CONTRACTS § 1. 17, and has recently been reaffirmed as part of the common law of Texas by this Court, *see Vanegas,* 302 S.W.3d at 302. In *Vanegas,* we held that when an employer offered to share five percent of the proceeds of a sale or merger of the company with certain employees if they remained employed until the sale or merger, a unilateral contract was formed when the employees remained employed for the requested time. *Id.* at 303. We noted that " 'unilateral contract analysis is applicable to the employer's promise to pay a bonus or pension to an employee in case the latter continues to serve for a stated period.' " *Id.* (quoting 2 JOSEPH M. PERILLO & HELEN HADJIYANNAKIS BENDER, CORBIN ON CONTRACTS § 6.2 (1995)). Thus, a unilateral employment contract is created when an employer promises an employee certain benefits in exchange for the employee's performance, and the employee performs.

**2. General Standing Ordinances as Unilateral Contracts**

■■■ Relying on *Overton v. City of Houston,* the City contends that general standing ordinances, however detailed, can never constitute a unilateral employment contract.[8] *See* 564 S.W.2d at 403–04. In *Overton,* employees relied on city ordinances in asserting a right to termination pay. *Id.* at 402. The First Court of Appeals declined to treat the ordinances as a contract for purposes of determinating the appropriate statute of limitations governing the case, stating: "The ordinances *alone* ... cannot form a contract with the plaintiffs in this case." *Id.* at 403–04 (emphasis added). To the extent the reasoning in *Overton* suggests an ordinance alone can never establish a unilateral contract, we disapprove it, and conclude that, in some circumstances, an ordinance or group of ordinances can constitute a unilateral contract.

A municipality utilizes ordinances as a means to conduct its business. *Cf. Cent. Power & Light Co. v. City of San Juan,* 962 S.W.2d 602, 613 (Tex.App.-Corpus Christi 1998, pet. dism'd w.o.j.). It is therefore unsurprising that this Court has implicitly recognized that municipalities sometimes contract with third parties by way of ordinance. *See City of San Antonio v. Frizzell,* 127 Tex. 119, 91 S.W.2d 1056, 1056–57 (1936) (noting that an ordinance evidenced the entire contract between a city and a third party). When an ordinance evidences a contract, and is

---

8. The City cites several other court of appeals decisions to support this contention as well, but these cases addressed the question of what limitations period applies to a *statutory* right, and none of them considered whether there was a contract. *See, e.g., Creps v. Bd. of Firemen's Relief & Ret. Fund Trs. of Amarillo,* 456 S.W.2d 434, 439–40 (Tex.Civ.App.-Amarillo 1970, writ ref'd n.r.e.).

sought to be enforced as one, we have construed it as any other contract. *See id.* (construing the ordinance as a contract, and ruling accordingly). We have further concluded that a statute (and ordinances passed pursuant to it) authorizing a pension plan for policemen and firefighters was "necessarily a part of the contract of employment." *Byrd v. City of Dallas,* 118 Tex. 28, 6 S.W.2d 738, 740 (1928). In *Byrd,* by virtue of their employment with the city and acceptance of the pension scheme, the policemen and firemen's participation in the pension plan became "as much a part of the agreed compensation as is the monthly stipend." *Id.* at 741. Although the pension scheme at the time of the decision was derived from a statute, it was also realized through ordinances. *See id.* at 739. Similarly, a franchise agreement between a municipality and a gas company was "embodied" in a city ordinance, apparently standing alone. *See S. Union Co. v. City of Edinburg,* 129 S.W.3d 74, 76 (Tex.2003). In reviewing the City of Edinburg's contract claims against a natural gas utility, we construed the city's ordinance as a contract, discerning from it the parties' intent and the scope of their respective obligations. *See id.* at 84–85.

■ We have also read two ordinances and related documents together as a single agreement, and noted that "a court may determine, as a matter of law, that multiple documents comprise a written contract." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840–41 (Tex.2000). It is "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent."[9] *Id.* at 840. In addition, the multiple documents need not contain all of the terms; instead, only the

essential terms are required. *Osborne v. Moore,* 112 Tex. 361, 247 S.W. 498, 499 (1923). Therefore, different ordinance sections can potentially be read together in a single contract. *See City of Fort Worth,* 22 S.W.3d at 840–41.

Further, no particular words are required to create a contract; therefore the fact that an ordinance does not contain the word "contract" in its text does not preclude it from having contractual effect. *See* 14 Tex. Jur.3d *Contracts* § 46 (2006); *Farmers' State Bank & Trust Co. v. Gorman Home Refinery,* 3 S.W.2d 65, 66 (Tex. Comm'n App.1928, judgm't adopted); *Coffman v. Woods,* 696 S.W.2d 386, 387–88 (Tex.App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.).

### 3. City Ordinances as Unilateral Contract Under Section 271.151(2)

■ Guided by these principles, we turn to the particular Ordinances at issue to determine if they constitute a unilateral employment contract between the City and the Firefighters within section 271.152's waiver of immunity. As discussed above, in order to determine if the Ordinances can collectively constitute a contract to which section 271.152 applies, we must determine whether five elements are met: (1) the contract must be in writing, (2) state the essential terms of the agreement, (3) provide for goods or services, (4) to the local governmental entity, and (5) be properly executed on behalf of the local governmental entity. Tex. Loc. Gov't Code § 271.151(2). Because the Ordinances at issue here meet each of these five elements, we conclude the Ordinances collectively constitute a unilateral employment contract between the City and the Firefighters, thereby meeting the third re-

---

9. This rule is echoed in statute of frauds jurisprudence: in order to satisfy a statute of frauds, multiple documents can be read together. Restatement (Second) of Contracts § 132.

quirement of section 271.152's waiver of immunity.

First, the Ordinances comprise a contract, and that contract is in writing. "A promise, acceptance of which will form a contract, 'is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2(1)). The City manifested its intention to act in a specific way in the Ordinances by its extensive use of the word "shall"[10] and similar provisions that make the benefits offered to the Firefighters mandatory upon performance. The Ordinances are authored by the City, and are addressed to a discrete group of offerees: those persons qualifying as "eligible employees," who are defined as "all classified members of the fire department." HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. III, § 34–59(a)(2). As such, the Ordinances constitute an offer that was communicated to the Firefighters, *see* RESTATEMENT OF CONTRACTS § 22, which the Firefighters accepted by performing, *see Vanegas*, 302 S.W.3d at 303.

The City's Ordinances further promised the Firefighters specific compensation in the form of overtime pay and termination pay. That promise required acceptance by performance, making the promise a unilateral contract that became binding when the Firefighters performed. *See id.* The performance the City requested is detailed in parts of Chapter 34, Article III,[11] of the Houston Code of Ordinances. *See* HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. III, §§ 34–46, 34–48, 34–50. Those sec-

tions describe the duties of the Firefighters generally, *id.* § 34–46, and of the three particular divisions of the fire department: fire prevention, *id.* §§ 34–48, 34–50(d), fire suppression, *id.* § 34–50(b), and fire alarm, *id.* § 34–50(c). These duties include valuable services such as "extinguishing fires and conflagrations and preventing loss of human life and property," *id.* § 34–50(b), "operating the fire alarm system," *id.* § 34–50(c), and "conducting inspections, reviewing plans for construction and conducting public information campaigns to reduce the loss of life and property by fire," *id.* § 34–50(d). The Firefighters each performed such services for various periods of time, rendering the City's promises binding as to each of them individually. Those promises included overtime compensation, *id.* § 34–59(a)(3), (b), (d), holidays, and compensation for holidays not taken, *id.* § 34–59(e)(1), (e)(2), (e)(6), sick leave, *id.* § 34–59(i), vacation leave, *id.* § 34–59(j), and compensation for accrued sick and vacation leave upon termination of employment, *id.* § 34–3(b).

The contract is also in writing. *See generally* HOUSTON, TEX., CODE OF ORDINANCES, ch. 34. As explained earlier, "written" contracts may be "embodied in more than one document," RESTATEMENT (SECOND) OF CONTRACTS § 95 cmt. b, including, as here, multiple ordinances, *see City of Fort Worth*, 22 S.W.3d at 840–41.

Second, the Ordinances state the essential terms of the agreement between the Firefighters and the City. Section 271.151(2) does not define "essential terms," but we have characterized "essential terms" as, among other things, "'the time of performance, the price to be paid,

---

**10.** *See, e.g.,* HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. I, § 34–3(b) ("[A]ny firefighter ... who leaves the classified service for any reason *shall* receive ....") (emphasis added); *id.*

§ 34–59(b) ("Any fireman ... *shall* be entitled to overtime pay ....") (emphasis added).

**11.** Article III is entitled "Fire Department."

... [and] the service to be rendered.'" *Kirby Lake Dev. Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838 (Tex. 2010) (quoting *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir. 2006)). In the context of employment agreements, typical essential terms include, among others, "compensation, duties or responsibilities." *Martin v. Credit Prot. Ass'n, Inc.*, 793 S.W.2d 667, 669 (Tex. 1990). Here, the Ordinances plainly reflect such terms. The time of performance is specified in the definitions of "workweek," HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. III § 34–59(a)(5), "time actually worked or actual work," *id.* § 34–59(a)(6), and "overtime," *id.* § 34–59(a)(3); and in the various holiday, vacation, and leave provisions, *id.* § 34–59(e), (i), (j). The price to be paid or compensation is located in the definitions of "overtime," *id.* § 34–59(a)(3), and "regular rate of pay," *id.* § 34–59(a)(4); and in the various termination pay, overtime, holiday, vacation, and leave provisions, *id.* §§ 34–3, 34–59(d), (e), (i), (j). The services to be rendered (duties or responsibilities) are likewise described in the Ordinances, as discussed above. *See id.* §§ 34–46, 34–48, 34–50 (describing the duties of the Firefighters).

Third, the Ordinances provide for goods or services. We have previously held that "services" under section 271.151(2) encompass a wide array of activities, generally including any act performed for the benefit of another. *Kirby Lake*, 320 S.W.3d at 839. The Firefighters benefitted the City by providing fire protection services as defined in the Ordinances themselves. HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. III, §§ 34–46, 34–48, 34–50.

Fourth, the services were provided to a local governmental entity. The services were rendered to the City, and the Firefighters' performance of those services was tracked by the fire chief. *See id.* § 34–

59(c); *see also Byrd*, 6 S.W.2d at 740–41 (noting that a pension plan was given to retired firefighters as compensation for services rendered to the City of Dallas).

Finally, the Ordinances were executed by the City. The City does not deny that the Ordinances were duly enacted, but does challenge whether they were "executed." Section 271.151(2) does not define "executed." We have noted that to "execute" means to "finish" or to "complete," and that it is not necessary to sign an instrument in order to execute it, unless the parties agree that a signature is required. *Mid–Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex.2010) (per curiam). No agreement between the City and the Firefighters establishing that a signature was required is before us. Therefore, the Ordinances, when duly enacted by the City with the intent to be bound, were "executed" under section 271.151(2). *See id.*

In summary, the Ordinances meet each of the five elements required by section 271.151(2), and thus comprise a unilateral employment contract within the scope of section 271.152's waiver of immunity.

**4. Debt in Violation of Article XI, Section 5, Texas Constitution**

In an effort to negate contractual intent behind the Ordinances, the City argues that it could not have intended to be contractually bound by the Ordinances, because doing so would create a debt in violation of Article XI, Section 5, of the Texas Constitution. Our Constitution ordains that "no debt shall ever be created by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and create a sinking fund of at least two per cent. thereon." TEX. CONST. art. XI, § 5. But we long ago noted that this prohibition does not extend to "that class of pecuniary obligations in good faith intend-

ed to be, and lawfully, payable out of either the current revenues for the year of the contract or any other fund within the immediate control" of the municipality. *McNeill v. City of Waco*, 89 Tex. 83, 33 S.W. 322, 323–24 (1895). In practice, municipal contract expenses can be covered with current revenues. *Cf. Mun. Admin. Servs. Inc. v. City of Beaumont*, 969 S.W.2d 31, 39 (Tex.App.-Texarkana 1998, no pet.). Therefore, Article XI, Section 5 does not necessarily preclude an ordinance-based contract.

### 5. Disclaimer of Vested Rights

In a further effort to negate contractual intent, the City asserts that Houston Ordinance No. 96–1088 disclaims any contractual effect in the Ordinances at issue in this case. Houston Ordinance No. 96–1088 provides:

> That the provisions of article III of chapter 14 of the Code of Ordinances, Houston, Texas, as amended in section 2 of this ordinance, are subject to amendment or repeal at any time and payment of benefits thereunder is subject to the appropriation or allocation of funds for that purpose by the city council. No provision of this ordinance shall be construed to create a vested right of compensation for sick leave benefits or, where applicable, for termination payments.

Houston, Tex., Ordinance 96–1088 § 7 (Oct. 23, 1996).

The City points us to several cases in which documents that might otherwise have constituted contracts included statements that effectively disclaimed contractual intent, particularly *County of Dallas*

*v. Wiland*, 216 S.W.3d 344 (Tex.2007). In *Wiland*, the disclaimer stated: "Nothing in this [manual] is to be construed as a contract of employment or a provision guaranteeing the specific term or tenure of employment." *Id.* at 349. We recognized that this statement precluded giving the manual in question any contractual effect. *Id.* at 352, 354. The City contends the instant ordinance likewise disclaims contractual intent. We disagree.

Disclaiming a vested right to compensation is not equivalent to a disclaimer of contractual intent—to the contrary, an employee may have a valid employment contract, promising that benefits will accrue upon performance, but those benefits will not vest until the employee actually performs. *See Vanegas*, 302 S.W.3d at 303 ("But whether the promise was illusory at the time it was made is irrelevant; what matters is whether the promise became enforceable by the time of the breach."). The disclaimer amounts to a warning to City employees that the City can change the benefits over time—in other words, the *offer* that the City is making, as regards to sick leave benefits, is subject to change.[12] At most, the disclaimer indicates that the promises contained in the Ordinances remained illusory until the Firefighters performed. *See id.* ("Almost all unilateral contracts begin as illusory promises.").

Further, the scope of the disclaimer in Ordinance 96–1088 is limited by its express language. It refers only to Article III of Chapter 14 of the Houston Code of Ordinances. That Article is concerned only with sick leave for City civil service employees generally, *see* HOUSTON, TEX., CODE

---

12. This warning is not strictly necessary; offerors generally have the power to revoke or modify offers until the offeree accepts or performs, assuming the revocation or modification is communicated to the offeree before any attempted acceptance. *See Antwine v.*

*Reed*, 145 Tex. 521, 199 S.W.2d 482, 485 (1947); RESTATEMENT(SECOND) OF CONTRACTS § 42 cmt. a, illus. 1 (offer that states it is open for thirty days can nevertheless be revoked the next day, unless it was an option contract).

OF ORDINANCES ch. 14, art. III, while the Ordinances the Firefighters point to as evidencing contractual intent are located in the Fire Department provisions of Chapter 34, not Chapter 14. The disclaimer is likewise limited to "sick leave benefits or, where applicable, for termination payments." The plain meaning of the clause "where applicable, for termination payments" is to include accrued sick leave benefits that would give rise to a termination payment. Thus, even if we accept the City's construction of the disclaimer—that it is a contractual disclaimer—its scope would only cover the Firefighters' right to that portion of their claims based on sick leave. But, in fact, the Firefighters' claims are based on several other components of compensation, such as premium pay, vacation leave, holiday leave, and overtime pay, *see City of Houston*, 183 S.W.3d at 419, 424, all of which fall outside the scope of any disclaimer achieved by Ordinance 96–1088.

### 6. Scope of Section 271.152's Waiver of Immunity

The City next claims that the Firefighters seek to avoid, rather than enforce, their ordinance-based contract, and their suit is therefore not a suit for *breach* of a contract within the limited scope of section 271.152's waiver. *See* TEX. LOC. GOV'T CODE § 271.152 (waiving immunity "for the purpose of adjudicating a claim for breach of the contract"). The pleadings provide some indication that the Firefighters' ultimate recovery could depend on a showing that certain parts of the City of Houston Code of Ordinances violated state law, specifically the civil service provisions of Chapters 142 and 143 of the Local Government Code. *See City of Houston*, 183 S.W.3d at 424–25. That indeed was the basis for much of the court of appeals' original opinion in favor of the Firefighters. *See generally id.* at 419–26. We

decline to decide whether any of the Ordinances violate these specific statutory provisions, leaving this merits determination to the trial court, *see Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000), but conclude the City's argument fails because the Firefighters' claim is, overall, one for breach of contract.

■ In determining whether jurisdiction is proper, we look to the pleadings, "construing them liberally in favor of the plaintiffs and looking to the pleader's intent." *City of Waco v. Kirwan*, 298 S.W.3d 618, 621 (Tex.2009). Viewing the Firefighters' pleadings as a whole, the Firefighters currently plead a cause of action for breach of contract.

■ Further, it is "settled that the laws which subsist at the time and place of the making of a contract . . . form a part of it, as if they were expressly referred to or incorporated in its terms." *Von Hoffman v. City of Quincy*, 71 U.S. 535, 550, 4 Wall. 535, 18 L.Ed. 403 (1867). Relevant statutes can form a part of an employment contract. *Byrd*, 6 S.W.2d at 740 (holding that a state law governing civil service pensions was "part of the contract of employment and is read into the contract as fully as though it had been actually incorporated therein"); *see also Wilson v. Andrews*, 10 S.W.3d 663, 667–68 (Tex.1999) (holding that the Civil Service Act, as amended, becomes part of the employment contract between a city and its firefighters when the city adopts it). The trial court may determine that at least some portions of the relevant statutes form a part of the unilateral contract between the City and Firefighters. Therefore, the Firefighters' suit is properly characterized as one for breach of contract.

### 7. Intersection of Local Government Code Sections 271.152 and 180.006

The City asserts the Legislature did not intend for section 271.152 to waive immunity in this type of suit, as evidenced by its subsequent enactment of Local Government Code section 180.006. The City argues that the Legislature's enactment of section 180.006—which prospectively waives governmental immunity from back-pay claims by police and firefighters[13]—would be a meaningless act if the same waiver already existed under section 271.152. The City contends the Firefighters' claims would clearly fall within the scope of section 180.006, but for the fact that section 180.006 is not retrospective. *See* Act of May 25, 2007, 80th Leg., R. S., ch. 1200, § 3, 2007 Tex. Gen. Laws 4071, 4072. Accordingly, the City claims that if the Legislature had intended to waive immunity for a suit of this type, it would have made the waiver in section 180.006 retrospective. The City invokes the rule of statutory construction that "the legislature is never presumed to do a useless act." *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 551 (Tex.1981). We disagree that applying section 271.152 here would in any way render section 180.006 "useless" given the distinctions between the two statutes.

Sections 180.006 and 271.152 differ significantly in scope and effect. Section 271.152 is a retroactive waiver of immunity, while section 180.006 is prospective only. *Compare* Act of May 23, 2005, 79th Leg., R. S., ch. 604, § 2, 2005 Tex. Gen. Laws 1548, 1549, *with* Act of May 25, 2007, 80th Leg., R.S., ch. 1200, § 4, 2007 Tex. Gen. Laws 4071, 4072. Section 271.152 applies to breaches of contract generally, while section 180.006 is limited to back-pay claims and related penalties only. *Compare* Tex. Loc. Gov't Code § 271.152, *with id.* § 180.006(b)–(c). Moreover, section 180.006 does not require a contract in writing, while section 271.152 does. *Compare id.* § 180.006(b), *with id.* § 271.151(2). Finally, section 180.006 is limited to a specific class of persons—civil service firefighters or police officers—while section 271.152 has no such limitation. *Compare id.* § 180.006(a), *with id.* § 271.152.

Although the Firefighters' suit might fall within the scope of both waivers if it accrued and were filed today, that does not render section 180.006 "useless." Because section 180.006 does not require a written contract, it also applies to those qualifying civil service firefighters and police officers who, unlike the Firefighters in this case, cannot point to a written contract, and for whom there was previously no waiver of immunity until its enactment. *See id.* § 180.006(a). Accordingly, the "no useless act" rule of construction does not preclude applying section 271.152 to the Firefighters' claims.[14]

---

**13.** Section 180.006 waives governmental immunity for suits by firefighters or police officers whose employment falls under (1) Chapters 141, 142, or 143 of the Local Government Code, (2) "a municipal charter provision conferring civil service benefits of a municipality that has not adopted Chapter 143," or (3) a municipal ordinance enacted under Chapter 142 or 143. Tex. Loc. Gov't Code § 180.006(a). The waiver is limited to "denial of monetary benefits associated with the recovery of back pay" and to certain related monetary penalties. *Id.* § 180.006(b)–(c). Finally, section 180.006's waiver does not apply to contract-based claims. *Id.* § 180.006(c).

**14.** Indeed, if the Legislature had intended to reinstate immunity from a suit like the Firefighters' when it enacted section 180.006, it could have done so by amending section 271.152. *See* Act of May 25, 2007, 80th Leg., R.S., ch. 1200, § 2, 2007 Tex. Gen. Laws 4071, 4071–72 (amending Chapter 174 of the Local Government Code in light of the addition of section 180.006). However, section 180.006's enabling Act provides that "[a] claim initially asserted before the effective date of this Act is governed by the law in effect when the claim was initially asserted, and the former law is continued in effect for that purpose." *Id.* § 3.

Moreover, section 271.152 is otherwise clear and unambiguous, and so there is no reason to speculate further as to legislative intent. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 651–52 (Tex.2006). We have determined that a written contract exists here, as embodied in the Ordinances, and the contract meets the elements the Legislature set forth in section 271.151(2). Therefore, by its plain language, section 271.152's waiver applies to this suit.

### 8. Other Considerations and Conclusion

Finally, the City and amici raise concerns about the impact of our holding, claiming it will transmute vast numbers of ordinances into contracts. But this fear overlooks the basic requirements of contract law—just as with any writing alleged to be a contract, an ordinance can only be enforced as a contract in a court of law if it satisfies the requirements of a contract. Moreover, most municipal ordinances will not function as contracts within the meaning of section 271.151(2), because most will not contain the detailed request for performance and promised compensation found in Chapter 34 of the Houston Code of Ordinances, nor will they be cognizable as an offer to identifiable offerees as these Ordinances are. In addition, as discussed above, ordinances have long functioned at times as contractual instruments in this state, without any apparent adverse effect. *See, e.g., City of San Antonio,* 91 S.W.2d at 1056–57.

In conclusion, because the Ordinances at issue are addressed to the Firefighters, promising in detail specific compensation in return for specified services, and meet each element in the definition of a contract

under Local Government Code section 271.151(2), we hold the relevant provisions of Chapter 34 of the City of Houston Code of Ordinances constitute a unilateral contract that became effective and enforceable as to these retired Firefighters who have completed the requested performance, and the City's immunity is thereby waived pursuant to section 271.152.[15]

### E. Civil Service Statutes as Contract

In their cross-petition, the Firefighters assert that certain provisions of Local Government Code Chapter 143 likewise constitute a contract between the City and the Firefighters. Chapter 143 creates a civil service classification system for emergency service personnel in those qualifying municipalities that vote to adopt it. TEX. LOC. GOV'T CODE § 143.002(a); *Wilson,* 10 S.W.3d at 666. The Firefighters argue that, when the City voted to "opt-in" to Chapter 143, the statute became an offer by the City that the Firefighters accepted by performing.

In order to qualify as a contract, the document or documents must evidence the parties' intent to be bound. *See Owen v. Hendricks,* 433 S.W.2d 164, 166–67 (Tex. 1968). That intention must be manifested in a way that justifies a promisee's understanding that a promise has been made to him. *See Montgomery Cnty. Hosp. Dist.,* 965 S.W.2d at 502. Because Chapter 143 was written by the Legislature, not by the City, we cannot presume that it is a communication of intent by the City. Rather, we must examine the manner in which the City adopted Chapter 143 to determine whether the City communicated an intent to be bound to any potential promisees. Although the original City Ordinance

---

15. We do not decide today whether other documents are incorporated by reference into the unilateral contract evidenced in Chapter 34, but simply note that, as with any contract, incorporation by reference is possible under contract law. *See City of Fort Worth,* 22 S.W.3d at 840–41.

adopting Chapter 143 is not part of the record, we note the reference to Chapter 143 that currently appears in the Houston Code of Ordinances is as follows:

At an election held in the city January 31, 1948, this Act was adopted by a majority vote of the votes cast at the election. It differs in many important respects from the city's civil service charter provisions (Art. Va of the foregoing charter) and no action should be taken in the matter of civil service, whether pertaining to policemen and firemen or to other employees without first consulting ch. 143 . . . since some of its provisions touch upon the entire subject of composition of the city's civil service commission and of the executive administration of the civil service functions.

HOUSTON, TEX., CODE OF ORDINANCES app. B.

■ Unlike the Ordinances discussed above, which make specific, detailed promises *to* the Firefighters, the above statement is addressed to City policy makers and the City's civil service commission. It is a warning to them that the City, having elected to be governed by the Civil Service Act, must comply with it, or risk adverse consequences in court. *See Wilson*, 10 S.W.3d at 668 ("As long as the Civil Service Act governs [the city], however, it must adhere to the Act[ ] . . . ."). In other words, it fails the basic contract requirement of communication of an offer to the offeree. *See* RESTATEMENT (SECOND) OF CONTRACTS § 24; RESTATEMENT OF CONTRACTS § 23 ("[I]t is essential to the existence of an offer that there should be a proposal by the offeror to the offeree . . . ."). Accordingly, we cannot say the City has adopted Chapter 143 in a manner that communicates a promise or an offer to the Firefighters. We thus conclude that Chapter 143 does not, in itself, constitute a contract entered into by the City, and so cannot be a "contract subject to this subchapter" for purposes of section 271.152's waiver of immunity.

■ We of course do not hold that a statute cannot be incorporated by reference into a contract—as mentioned above, the trial court may conclude that at least some portions of Chapter 143 were incorporated by reference into the unilateral employment contract at issue here. Rather, we hold that when a municipality adopts Chapter 143—without sufficient manifestation of an intent to be *contractually bound* in the ordinance or other instrument by which it is adopted—Chapter 143 does not, in itself, constitute a standalone municipal contract.[16]

**F. The Agreements as Contracts for Purposes of Local Government Code Section 271.152's Waiver of Governmental Immunity**

As a final basis for waiver of immunity under Local Government Code section 271.152, the Firefighters' cross-petition also attacks the court of appeals' holding that those Firefighters whose employment fell within the scope of the MCAs and the CBA lacked standing to sue under those Agreements. 290 S.W.3d at 271. Finding a lack of standing, the court of appeals did not reach the issue of whether the Agreements qualify under section 271.152's waiver of immunity. *See id.* We first address the issue of standing, then determine whether the Agreements fall within the

---

**16.** The parties' briefs also contest whether (1) Chapter 143 was "executed on behalf of the local governmental entity" within the meaning of Local Government Code section 271.151(2), or (2) the City waived that issue in the lower courts. Because Chapter 143 does not independently constitute a contract between the Firefighters and the City, we do not reach either issue.

scope of section 271.151(2)'s definition of a "contract subject to this subchapter."

██ Standing is a constitutional prerequisite to suit. *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex.2001). It is founded in the separation-of-powers doctrine, and in the Texas open-courts provision. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 447 (Tex.1993). The separation-of-powers doctrine precludes courts from issuing advisory opinions on abstract questions of law that do not bind actual parties. *See* TEX. CONST. art. II, § 1; *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001). In complementary fashion, the open-courts provision guarantees access to the courts, but the purpose is to make whole those who have suffered actual injury, not to provide a forum for general injuries or hypothetical complaints. *Tex. Air Control Bd.*, 852 S.W.2d at 444. "Thus, as a general rule, to have standing an individual must demonstrate a particularized interest ... distinct from ... the public at large." *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 307 (Tex.2007) (per curiam).

### 1. Standing Under the MCAs

In holding the Firefighters had no standing to sue for alleged breaches of the MCAs, the court of appeals invoked the doctrine of *inclusio unius est exclusio alterius*, 290 S.W.3d at 271, which is the presumption that purposeful inclusion of specific terms in a writing implies the purposeful exclusion of terms that do not appear. *See Newman v. Blum*, 9 S.W. 178, 178 (Tex.1888). Both MCAs state they were negotiated "by and between the Houston Professional Fire Fighters Association and the City of Houston, Texas." Both provide that grievances may be resolved either through the statutory grievance procedures of Local Government Code sections 143.127–.134, or by judicial resolution under section 143.206 upon "ap-

plication by either party." Section 143.206 (which the MCAs incorporate by reference) likewise speaks in terms of "either party" and "other party." TEX. LOC. GOV'T CODE § 143.206(b). "The state district court of the judicial district in which the municipality is located has full authority and jurisdiction on the application of *either party* aggrieved by an action or omission of the *other party* . . . ." *Id.* (emphasis added). From this language, applying the *inclusio unius* doctrine, the court of appeals concluded that only the Union and the City had standing to sue for breach of the MCAs. 290 S.W.3d at 271. Although *inclusio unius* is a sound maxim of construction, judicial review cannot start and end on such a narrow basis when, as here, there is another valid ground to confer standing—the Firefighters' status as third-party beneficiaries under the MCAs.

██ Texas law recognizes that third parties have standing to recover under a contract that is clearly intended for their direct benefit. *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex.2002) (per curiam). In determining whether there is intent to benefit a third party, we look to the entire agreement, giving effect to all its provisions. *Id.* at 590. The contract need not have been executed *solely* to benefit the noncontracting party. *Id.* at 591. We do not create a third-party benefit by implication; the presumption is the parties contracted only for themselves, absent a clear showing of intent otherwise. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651–52 (Tex.1999). However, the agreement need not state "third-party beneficiary" or any similar magic words. *See Stine*, 80 S.W.3d at 590–91. Finally, a third party cannot enforce a contract if the third party benefits only incidentally from it. *MCI*, 995 S.W.2d at 651–52.

The MCAs reflect an intent to benefit the Firefighters as third parties to the agreements—indeed, the Union was required by its duty of representation to seek benefits for the Firefighters in the agreements. Both agreements make this purpose plain in their preambles by stating that one purpose is to provide certain wages, hours, and conditions of employment.[17] Both agreements directly guarantee benefits to the Firefighters, in particular in terms of salary and termination payments,[18] overtime pay,[19] and vacation leave.[20] These benefits are not offered to the world at large as a general beneficence, but are limited to the Firefighters through the definition of "employee"[21] included in the agreements. These guarantees of compensation are not promised to the City or to the Union, but to the Firefighters. As such, the City and the Union expressed a clear intent to benefit the Firefighters when they contracted through the MCAs.[22] Accordingly, the Firefighters have standing to enforce the agreements.[23]

17. Both the 1995 and 1997 MCAs contain the following statement of purpose in their preambles: "It is the purpose of this Agreement to achieve and maintain harmonious relations between the parties; to establish proper standards for wages, hours and other conditions of employment; and to provide for equitable and peaceful adjustments to differences which may arise."

18. Article 16 of the 1995 MCA and Article 19 of the 1997 MCA make the following promises, among others, as to the Firefighters' salary: (1) longevity pay of two dollars biweekly for year of service, up to twenty-five years maximum, (2) classification pay as specified in Local Government Code sections 141.033(b) and 143.111, (3) educational incentive pay, assignment pay, and bilingual pay as per Local Government Code sections 143.112 and 143.113 and applicable ordinances, and (4) lump-sum termination pay for "all unpaid salary, accumulated overtime, and compensatory time. They shall also receive a lump sum payment for vacation leave, holiday leave, and sick leave in accordance with Texas Local Government Code §§ 143.115, 143.1155 and 143.116, and applicable City of Houston Ordinances."

19. Article 7 of the 1995 MCA and Article 9 of the 1997 MCA both state "All overtime pay and hours calculations ... shall be governed by the Fair Labor Standards Act, and the Texas Local Government Code Chapter 142 and applicable city ordinances."

20. Article 17 of the 1995 MCA and Article 20 of the 1997 MCA both promise vacation leave as per Local Government Code § 143.046, "except that employees with [fifteen] or more years of seniority will earn one (1) additional vacation day with pay per year for each year of longevity in excess of [fifteen], to a maximum of [twenty-two] vacation days per year."

21. Article 1 of both MCAs defines "employee" as: "all fire fighters, as the term fire fighter is defined in Texas Local Government Code § 143.003(4), in the Houston Fire Department except the head of the department and assistant department heads in the rank or classification immediately below that of the department head."

22. It is worth noting that although some language in Local Government Code Chapter 143 likewise appears intended to benefit firefighters and police officers, that language is not found in a contract, but in a statute (as discussed above). Third-party beneficiary status is a rule of contract law, not of statutory enforcement or interpretation. As such, third-party beneficiary analysis, while relevant to the MCAs as contracts, is irrelevant to the preceding discussion of Chapter 143, because it is not, in itself, a contract.

23. The City also asserts the Firefighters lack standing because they failed to exhaust the grievance procedures under the MCAs. The court of appeals did not reach this issue, having incorrectly found a lack of standing based on the language in the MCAs and section 143.206. We do not decide it either, finding it waived by the City's stipulation that "[a]t the time each Plaintiff received their termination pay check, Plaintiffs were no longer subject to the jurisdiction of the Civil Service Commission of the City of Houston,

## 2. Standing under the CBA

The City asserts two arguments to defeat the Firefighters' claim to standing under the CBA: failure to establish a breach of the duty of fair representation by the Firefighters' Union, and failure to exhaust the CBA's grievance procedures. We reject both objections, and conclude the Firefighters have standing as third-party beneficiaries to sue for breach of the CBA.

 The court of appeals held the Firefighters lack standing under the CBA because they failed to establish that their Union breached its duty of fair representation. The court of appeals reasoned that showing such a breach "is an 'indispensable predicate' to an employee's action against the City for violation of the collective bargaining agreement." 290 S.W.3d at 271 (quoting *Metro. Transit Auth. v. Burks*, 79 S.W.3d 254, 257 (Tex.App.-Houston [14th Dist.] 2002, no pet.)). However, that "predicate" only applies to "hybrid" suits-cases in which the employee alleges both breach of the collective bargaining agreement by the employer, *and* breach of the duty of fair representation by the union, as when the union has mishandled grievance and arbitration proceedings. *See Reed v. United Transp. Union*, 488 U.S. 319, 328, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). It typically is an issue in suits under federal labor law, such as when an employee who is covered by a collective bargaining agreement sues for wrongful termination *after* losing under grievance and binding arbitration procedures. *See*

*United Parcel Serv., Inc. v. Mitchell,* 451 U.S. 56, 62, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981). Here, no grievance or arbitration occurred at all, so whether the Union breached its duty is not an issue. *See id.* As such, the Firefighters are not required to establish the predicate of any breach of duty. In short, the rule invoked by the court of appeals does not apply to this case.

The City argues in the alternative the Firefighters have no standing under the CBA because they have not exhausted the administrative remedies required by it.[24] This argument ignores the undisputed fact that the Firefighters are no longer active employees or members of the bargaining unit, but are retirees. As retirees, the CBA's grievance procedures by their own plain language no longer apply to the Firefighters.

 Once employees retire, they cease to be employees and become retirees. *See Allied Chem. & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 168, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). "The ordinary meaning of 'employee' does not include retired workers; retired employees have ceased to work for another for hire." *Id.* Indeed, such retirees are no longer even a part of the collective bargaining unit. *Id.* at 175–76, 92 S.Ct. 383. This is so not only because they are no longer employees, but because their interests are no longer adequately aligned with that of active employ-

Texas or the grievance procedure in Texas Local Government Code, Chapter 143." *See Shepherd v. Ledford,* 962 S.W.2d 28, 33 (Tex. 1998). Since the grievance procedure in both MCAs is simply an incorporation of Chapter 143 by reference, the City's stipulation and waiver extends to them. Indeed, the court of appeals originally acknowledged this stipulation and held the Firefighters were not re-

quired to exhaust the grievance procedures. *City of Houston,* 183 S.W.3d at 416, 416 n. 4.

**24.** The court of appeals did not reach this issue, finding a lack of standing when it incorrectly concluded the Firefighters were required to show a breach by the Union of the duty of fair representation, as discussed above.

ees so as to be jointly represented as a unit. *Id.* at 172–73, 92 S.Ct. 383.

The CBA's plain language does not include retired firefighters in the class of persons who are bound by the Agreement.[25] Article 14 of the CBA makes the grievance procedure available only to the Union and active firefighters: "The Association or any *bargaining unit Firefighter* may file a grievance under the terms of this Agreement." (Emphasis added.) Article 1 of the CBA defines both "Member of the Bargaining Unit" and "Firefighter" as "any full time, permanent paid employee" of the Fire Department. As retirees, the Firefighters do not meet that definition: they are no longer full-time employees, nor are they paid employees. *See id.* at 168, 92 S.Ct. 383. Therefore they do not fall within the class of persons to whom the grievance procedure is made available.

Moreover, the terms of the grievance procedures confirm that they do not logically apply to retirees like the Firefighters. Article 14, section 2, of the CBA encourages an aggrieved firefighter to "verbally inform his/her immediate supervisor of the grievance." As retirees, the Firefighters have no immediate supervisors to inform.

Further, because the Firefighters' cause of action only accrued when they received their allegedly deficient termination payments, which was after they retired, they had no grievance to assert during the time period when they were employees governed by the CBA's grievance procedures. Accordingly, we conclude the Firefighters' failure to exhaust the CBA's administra-tive remedies is not a bar to their standing to sue.

Finally, as with the MCAs, the Firefighters have standing as third-party beneficiaries under the CBA. Like the MCAs, it was negotiated by the Union with the clear intent to benefit the Firefighters. Significantly, collective bargaining agreements are recognized as a type of third-party beneficiary contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 302 cmt. d, illus. 14 ("A, a labor union, enters into a collective bargaining agreement with B, an employer, in which B promises not to discriminate against any employee because of his membership in A. All B's employees who are members of A are intended beneficiaries of the promise.").

The CBA states:

It is the intent and purpose of this Agreement to achieve and maintain harmonious relations between the parties, adjust and to establish the rates of pay, hours of work, and other conditions of employment for all Bargaining Unit Members and provide for the equitable and orderly adjustment of grievances which may arise during the term of this Agreement.

In its references to rates of pay, hours of work, and conditions of employment, this is a clear statement of an intent to benefit parties other than the Union and the City. As former Bargaining Unit Members, the Firefighters became entitled to rights under the agreement by performing in accordance with it. Like the MCAs, the CBA made specific promises to the Firefighters when they were active employees. In particular, these included terms con-

---

25. Article 1 of the CBA provides: " 'Member,' 'Employee,' 'Firefighter,' 'Member of the Bargaining Unit' means any *full time, permanent* paid employee of the Houston Fire Department who has been hired in substantial com-pliance with Chapter 143 of the Texas Local Government Code excluding municipal employees (civilians), volunteer fire fighters, applicants and the head of the Fire Department (Fire Chief)." (Emphasis added.)

cerning salary,[26] overtime pay,[27] sick leave,[28] and vacation leave.[29] All these provisions in the CBA demonstrate a manifest intent to benefit the Firefighters by guaranteeing certain terms of compensation to them. As such, we conclude the Firefighters have standing as third-party beneficiaries to enforce the CBA.

### 3. Section 271.152's Waiver of Immunity as to the MCAs and CBA

▉ The MCAs and CBA, like the Ordinances, constitute contracts subject to section 271.152's waiver of immunity, because they also meet the five definitional elements in section 271.151(2). First, they are indisputably written contracts. Second, they each state the essential terms of the agreement, such as salary, overtime compensation, vacation leave, and work conditions. Third, like the Ordinances, they provide for services, namely the provision of fire protection services to the City. Fourth, the services are provided to a local governmental entity—the City. Finally, all three Agreements are signed by the mayor of the City, who appears to have been duly authorized to do so, thus constituting execution of the Agreements.

## IV. Conclusion

Having concluded the City entered into a unilateral contract with the Firefighters

through its Ordinances, and because the Legislature waived the City's immunity from suit through its enactment of Local Government Code section 271.152 for a suit claiming breach of that contract, we hold the trial court properly denied the City's plea to the jurisdiction. We also hold that section 271.152 waives immunity from suit for breach of the MCAs and CBA, and the Firefighters have standing to sue under those Agreements. Finally, we hold Chapter 143 of the Local Government Code, as adopted by the City, does not, in itself, constitute a contract between the City and the Firefighters, and it therefore is not a contract within the scope of section 271.152's waiver of immunity. Accordingly, we affirm the judgment of the court of appeals in part, reverse in part, and remand the case to the trial court for further proceedings consistent with this opinion.

## Appendix

HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. I, § 34–3(b)—Payment for sick or vacation leave upon firemen's or policemen's death or termination of employment; repayment upon reemployment.

(a) Reserved.

(b) Firefighters or police officers who are members of the classified service of

---

26. Article 21 sets base salary, while Article 23 includes additional salary components, including among others: longevity pay, classification pay, and education and training pay.

27. Article 29 specifies regular work hours for Emergency Operations Division firefighters as an average of 46.7 hours per week, in twenty-four-hour shifts, within a seventy-two-day work cycle. Article 30 provides: "Except as may otherwise be specified in the terms of this Agreement, all Firefighters shall be compensated at the rate of time-and-one-half (1½) that of their regular rate of pay for all actual hours worked outside that of their regular scheduled 24 hour shift or work schedule."

28. Article 20 governs sick leave by incorporating by reference "Chapter 143 of the Texas Local Government Code and applicable federal statutes."

29. Article 26 provides modifications to the Firefighters' existing vacation leave entitlement, allowing them to use vacation leave accrued in a year within the same year, but requiring that a "Firefighter may request the use of additional accrued leave balances, which shall be subject to the scheduling needs of the Department."

the fire and police departments of the city may accumulate vacation time to a total of 720 working hours; however, any firefighter or police officer who leaves the classified service for any reason shall receive, in a lump sum payment, the full amount of his salary for the period of his accumulated vacation leave, minus any hours of vacation leave previously taken during the calendar year in which the termination occurs. However, any fire fighter or police officer who loses his life, or is forced to leave the classified service, as a result of a line of duty injury or illness, or the beneficiaries of such fire fighter or police officer, shall receive in a lump sum payment the full amount of his salary for the total number of his working hours of accumulated vacation time.

(c) For purposes of determining the amount to which a fireman or policeman or his beneficiaries is entitled under subsections (a) and (b) of this section, "salary" shall mean the authorized base pay of the employee plus the longevity rate he has attained up to the date of separation or death. For purposes of this section, "salary" shall not include educational or training incentive pay or any other form of premium pay except as provided above.

(d) Reserved.

(Code 1968, § 2–35; Ord. No. 71–1592, § 1, 9–1–71; Ord. No. 75–139, § 1, 1–28–75; Ord. No. 76–1882, § 1, 11–2–76; Ord. No. 78–180, § 1, 2–1–78; Ord. No. 90–1138, § 2, 9–19–90; Ord. No. 96–1076, § 5, 10–16–96; Ord. No. 96–1088, § 4, 10–23–96).

HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. III, § 34–46–Created; duties generally.

There is hereby created a fire department, the officers and employees of which, excepting those attending the firemen's training school, those designated as apprentice fireman and those who are on probation, are charged with the duty of preventing and extinguishing fires and conflagrations and preventing the loss of human life and property by fire, and doing all such other duties as are imposed upon them by ordinance of the city council. In addition to the duties and functions specifically set forth in this article for the various officers of the fire department, each of such officers and those employees acting under them shall perform such other and further duties as may be required of them by the mayor or their superior officers, or by the provisions of the state law, the Charter and ordinances of the city.

(Code 1968, § 18–1; Ord. No. 73–2079, § 1, 11–21–73).

HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. III, § 34–48—Fire prevention division; duties generally.

The fire prevention division of the fire department and its personnel shall be charged with the primary duty of enforcing all laws of the state and ordinances of the city covering the following:

(1) The prevention of fires.

(2) The storage and use of explosives and inflammables.

(3) The installation and maintenance of automatic and other fire alarm systems and protection systems, fire extinguishers and equipment.

(4) The maintenance and regulation of fire escapes.

(5) The means and adequacy of exits in cases of fires from factories, schools, lodging houses, convalescent homes, hotels, asylums, hospitals, churches, public halls, theaters, and in all other places where numbers of persons work, live, or congregate from time to time for any purposes.

(6) The investigation of causes, origin and circumstances of fire.

(7) The conducting of fire prevention campaigns and the circulation of fire prevention literature, for the benefit of civic clubs, labor organizations, business and commercial enterprises, schools, factories, lodging houses, hotels, lodges, hospitals, convalescent homes, churches, halls, theaters and the general public in the interest of fire prevention and public safety.

(8) Such other duties as may be imposed from time to time by the mayor, the laws of the state, ordinances of the city, and by the chief of the fire department and the fire marshal.

(Code 1968, § 18–3; Ord. No. 73–2079, § 1, 11–21–73).

HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. III, § 34–50—Divisions of fire department; general duties and responsibilities of each division.

(a) The fire department shall consist of three divisions, to be known as the fire suppression division, the fire alarm division and the fire prevention division.

(b) The fire suppression division and its personnel shall be charged with the primary duty of extinguishing fires and conflagrations and preventing the loss of human life and property by fire.

(c) The fire alarm division of the fire department and its personnel shall be charged with the primary duty of operating the fire alarm system in the city, and performing or causing to be performed such other duties and functions as may be assigned to or required of it or them by the mayor, the chief of the fire department, by state law and the provisions of the Charter or ordinances of the city.

(d) The fire prevention division and its personnel shall be charged with the primary duty of conducting inspections, reviewing plans for construction and conducting public information campaigns to reduce the loss of life and property by fire.

(e) In addition to the duties of the divisions and their personnel, as hereinabove set out, each division and its personnel shall do and perform, or cause to be done and performed, such other duties and functions as may be assigned to or required of such section by the mayor, the fire chief, and the provisions of the state law, the Charter and ordinances of the city.

(Code 1968, § 18–5; Ord. No. 73–2079, § 1, 11–21–73; Ord. No.2010–803, § 9, 10–13–2010).

HOUSTON, TEX., CODE OF ORDINANCES ch. 34, art. III, § 34–59—Workweek; overtime compensation; sick leave; vacation leave.

(a) Definitions. Unless otherwise indicated, the following words shall, for purposes of this section, have the following meanings:

(1) *Compensatory time* or *compensatory time off.* Hours during which eligible employees are not working and which are not counted as hours worked during the applicable workweek for purposes of overtime compensation and for which the employee is compensated at the employee's regular rate.

(2) *Eligible employee.* All classified members of the fire department subject to the provisions of articles 1269m and 1269p of the Revised Civil Statutes of Texas.

(3) *Overtime.* Dependent upon the duty assignment and work cycle of the firemen, overtime shall be that time worked in excess of either:

a. 40 hours in a workweek; or

b. An average number of hours of actual work per week over a calendar year of 46.7 hours as authorized by the provisions of article 1269p.

(4) *Regular rate of pay.* Regular rate of pay shall include:

a. Base pay;

b. Longevity pay;

c. Educational incentive pay;

d. Assignment pay; and

e. Higher classification pay where authorized.

The term "regular rate of pay" shall not include compensation excluded under Section 7(e) of the Fair Labor Standards Act of 1938, as amended, or the interpretative regulations and administrative or judicial opinions construing that section.

(5) *Workweek.* Dependent upon the duty assignment and work cycle of the fireman, the workweek shall be either:

a. Forty hours of actual work within the consecutive one hundred sixty-eight-hour period beginning with the dayshift Saturday; or

b. An average number of hours of actual work per week over a calendar year of 46.7 hours as authorized by the provisions of article 1269p.

(6) *Time actually worked* or *actual work.* The time the employee is actually on duty or on a council declared holiday, on authorized sick leave, vacation leave, compensatory time off, death in the family leave or any other authorized leave, provided that this is for the purpose of overtime calculations dealt with in this section only and not for purposes of determining compliance with article 1269p, section 6(D) of the Revised Civil Statutes of Texas, which shall be governed by state law. Hours spent by a fireman doing the work of an injured or ill fireman pursuant to section 26(h) of article 1269m shall not count as hours worked for purposes of overtime compensation. Hours worked in "substitution" pursuant to subsection (f) hereof shall not be counted as time actually worked for purposes of overtime compensation. Calculation of time actually worked shall commence upon the arrival of the fireman at his or her assigned place of duty for the particular duty day at the time established for the commencement of the work shift.

(b) Eligible employees shall have a regularly scheduled workweek on a schedule established by the department. Any fireman whose duties involve either the extinguishment of fires or the delivery of emergency medical services shall be entitled to overtime pay for those hours in excess of the scheduled work cycle as established pursuant to article 1269p. Any fireman whose duty assignment is not described by the foregoing shall be entitled to overtime pay for all time actually worked in excess of his or her forty-hour workweek.

(c) The fire chief shall cause to be maintained accurate, complete and permanent records of all employee attendance and time actually worked during each workweek. He shall make reports of attendance and time actually worked as may be prescribed by the civil service commission. He shall certify the correctness of the reports. The reports shall be forwarded to the human resources department on a weekly basis.

(d) All eligible employees shall be compensated for working overtime beyond their regularly scheduled workweek by the payment of either monetary compensation at the rate of 1½ times their regular rate of pay or compensatory time at the rate of 1½ hours for each overtime hour worked. The following shall apply

to the payment of overtime compensation:

(1) The fire chief or his designated subordinate shall verify that the overtime is needed to complete a required city service or operation.

(2) Upon request of the fireman, the fire chief may, in his discretion, grant compensatory time in lieu of cash payment for overtime. Where overtime is paid in cash it shall be paid in the pay period in which it is earned or as soon thereafter as is possible, taking into consideration both the work cycle and the payroll system used.

(3) Where the employee is granted compensatory time the following shall apply:

a. The number of hours of compensatory time which may be accumulated shall not exceed 480.

b. Accrued compensatory time which is given must be used within 365 calendar days from the date accrued, provided that it does not unduly disrupt departmental operations. The fire chief shall issue appropriate regulations governing the use of compensatory time.

c. Accrued compensatory time not taken within 365 days from the date of accrual shall be paid for, in cash, at the greater of:

1. The employee's average regular rate of pay over the employee's last three years of employment by the city preceding the date of payment; or

2. The employee's regular rate of pay as of the end of the pay period preceding the date of payment.

Such payment shall be made in the pay period following expiration of the three hundred sixty-five-day period.

d. The fire department shall maintain detailed records of the accumulation and use of compensatory time on a form prescribed by the human resources director.

e. Accumulated compensatory time shall be used in accordance with the first-in-first-out (FIFO) accounting principle.

f. Any compensatory time accrued prior to April 15, 1986 and not used shall be carried on the records of the department until such time as it is used by the employee. The employee shall not be entitled to monetary compensation for any compensatory time accrued prior to April 15, 1986.

(e) All classified firefighters of the fire department who are subject to the provisions of chapter 142 and chapter 143 of the Local Government Code shall be entitled to the same number of holidays or days in lieu thereof as are granted to all other employees of the city as provided below:

(1) All holidays shall have an accrual value of eight hours. When a classified employee is unable to take the holiday, he or she shall have eight hours posted to his or her accrued holiday balance. When an accrued holiday day is taken in lieu of the regularly scheduled holiday, eight hours will be charged; however, its usage value will be dependent upon the shift worked by the classified employee at the time the day in lieu of the holiday is taken. Any classified employee in the Emergency Operations Division assigned to the average of 46.7 hours per week work schedule shall receive 12 hours off for each holiday accrued. Classified personnel assigned to ten-hour work days shall receive ten hours of leave and all other classified personnel shall receive eight hours off for each holiday accrued.

(2) Where a holiday falls on a regularly scheduled day off, any employee so affected shall accrue the holiday in the

manner described in subsection (e)(1) above.

(3) Employees in the Emergency Operations Division and assigned to the average of 46.7 hours per week work schedule who are normally scheduled to work on the actual dates of July 4th, December 24th, December 25th, and January 1st, as well as the following City approved Holidays (Martin Luther King Jr. Day, Memorial Day, Labor Day, Veteran's Day, Thanksgiving Day, and the day after Thanksgiving Day) shall accrue two holidays, provided the member is physically on-duty and completes the entire 24–hour shift, beginning at 0630 hours of the holiday in question. The holidays will accrue as two eight-hour accruals for the holiday shift worked. Employees in the Emergency Operations Division, not normally scheduled to work, that are called in to work on the actual dates of July 4th, December 24th, December 25th, and January 1st, as well as the following City approved Holidays (Martin Luther King Jr. Day, Memorial Day, Labor Day, Veteran's Day, Thanksgiving Day) shall accrue one eight-hour accrual for the holiday shift worked.

(4) Employees in the Emergency Operations Division and assigned to the average of 46.7 hours per week work schedule who are not normally scheduled to work, that are called in to work on the actual dates of July 4th, December 24th, December 25th and January 1st, as well as the following City approved Holidays (Martin Luther King Jr. Day, Memorial Day, Labor Day, Veteran's Day, Thanksgiving Day, and the day after Thanksgiving Day) shall be paid at the rate of time and one-half the hourly rate for actual hours worked during the 24–hour period beginning at 0630 hours of the holiday in question in lieu of the extra board straight time rate.

(5) When a holiday occurs during any paid leave of absence (vacation, sick time, injury on duty, etc.), the holiday is considered to have not been observed and the holiday shall be accrued and that day's absence will be changed against paid leave.

(6) Any classified employee who terminates his or her employment and has an accrued holiday leave-balance shall be paid for such holidays, not to exceed a total of 11 holidays. The limitation of 11 holidays shall not apply to a classified employee who leaves the classified service because of disability or death, and in such event, the employee, or his/her estate, shall be paid for all of the accrued holiday balance. All holidays for which payment is made upon termination, disability or death shall be valued at eight hours, regardless of the scheduled work hours or duties assigned to the firefighter at the time they were earned.

(f) The fire chief shall prepare and issue administrative guidelines to implement the provisions of section 26(h) of article 1269m wherein firemen are authorized to voluntarily do the work of an injured or ill fireman.

(g) If the fire chief elects to permit "substitution," as that term is used in the context of the Fair Labor Standards Act and as the practice is described by section 7 of article 1269p, he shall prepare and issue administrative guidelines to implement the provisions of section 7 of article 1269p subject to all applicable provisions of the Fair Labor Standards Act and the interpretations thereof.

(h) The fire chief shall prepare and issue administrative guidelines regarding on-call status for firemen. Such guidelines shall be structured so as to limit

the number of firemen on-call to a number reasonably required to meet the needs of the department. Further, such policy shall conform with the standards pertaining to overtime pay for on-call time under the Fair Labor Standards Act of 1938, as amended, and the interpretations thereof.

(i) Employees of the fire department classified pursuant to article 1269m of the Revised Civil Statutes of Texas, shall be allowed sick leave consistent with the provisions of section 26(b)(a) of article 1269m and Ordinance No. 84–1962, as amended. When a sick day is taken, its value will be dependent upon the shift or duty assignment held by the fireman at the time the day is taken. Any fireman engaged in fighting fires or the actual delivery of emergency medical services shall receive 12 hours off for each sick day taken. All other classified personnel shall receive eight hours off for each sick day taken. Officers and employees whose absences on authorized sick leave are for periods other than a full working day as defined herein shall be assessed sick leave in proportion to the number of full working days or fraction thereof they are absent.

(j) Officers and employees of the fire department classified pursuant to article 1269m of the Revised Civil Statutes of Texas, shall earn 15 days of vacation with pay per year to be accrued at a rate of 1¼ days per month. After 15 years of service employees shall be entitled to a vacation according to the following schedule:

| | |
|---|---|
| 16 years . . . . . | 16 days |
| 17 years . . . . . | 17 days |
| 18 years . . . . . | 18 days |
| 19 years . . . . . | 19 days |
| 20 years . . . . . | 20 days |
| 21 years . . . . . | 21 days |
| 22 years . . . . . | 22 days |
| 23 or more years . . . . . | 22 days |

When a vacation day is taken, its value will be dependent upon the shift held by the fireman at the time the day is taken. Any fireman engaged in fighting fires or the actual delivery of emergency medical services shall receive 12 hours off for each vacation day taken. All other classified personnel shall receive eight hours off for each vacation day taken. Officers and employees whose absences on authorized vacation leave are for periods other than a full working day as defined herein shall be assessed vacation leave in proportion to the number of full working days or fractions thereof they are absent.

(Code 1968, § 18–20; Ord. No. 73–2079, § 1, 11–21–73; Ord. No. 74–2184, § 1, 12–17–74; Ord. No. 77–2411, § 1, 11–22–77; Ord. No. 79–1035, § 1, 6–21–79; Ord. No. 80–2873, § 1, 9–30–80; Ord. No. 81–1319, § 1, 7–8–81; Ord. No. 86–489, § 1, 4–9–86; Ord. No. 86–517, § 1, 4–15–86; Ord. No. 92–1412, § 1, 10–28–92; Ord. No. 94–189, § 1, 2–23–94; Ord. No. 94–1005, § 1, 9–21–94; Ord. No. 96–1290, §§ 25, 26, 12–4–96; Ord. No. 98–669, § 1, 8–19–98).